UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN K. HENDRICKS, M.D.,

    Plaintiff-Relator,

v.

BRONSON METHODIST HOSPITAL,
INC., et al.,

    Defendants.
_____/

CASE NO. 1:13-CV-294

HON. ROBERT J. JONKER

**OPINION**

This matter is before the Court on Defendants' Motion to Dismiss Counts I, II, IV, and IX of Relator's First Amended Complaint (docket # 43). The Court has thoroughly reviewed the record and carefully considered the applicable law. The Court heard preliminary oral argument on the motion at the Rule 16 conference and does not believe further oral argument is necessary. The motion is ready for decision.

    **A.**    **Procedural Background**

Relator Susan K. Hendricks brought this *qui tam* action on March 19, 2013. As Relator, Dr. Hendricks asserts claims under the False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA"), and the Michigan Medicaid False Claims Act, MICH. COMP. L. § 400.601 *et seq*. (the "MMFCA"). Dr. Hendricks also brings several claims in her individual capacity. The United States and the State of Michigan each elected not to intervene in this action, and the complaint was unsealed on November 1, 2013 (docket # 23). Dr. Hendricks filed an amended complaint on February 28, 2014

(docket # 42). Defendants now move to dismiss all of the counts Dr. Hendricks brings as Relator (Counts I, II, IV) and one of the counts she brings individually (Count IX). (docket # 43.)

### B.     Pleadings and Motion to Dismiss

The First Amended Complaint makes the following allegations, among others. Dr. Hendricks worked for Defendants Bronson Methodist Hospital, Inc. (the "Hospital") and Bronson Healthcare Group., Inc. (the "Healthcare Group") from approximately March 2003 until May 2011 as a Maternal Fetal Medicine Physician, or perinatologist. (Am. Compl., docket # 42, at ¶¶ I, 26.) On or around October 10, 2010, Defendants and Dr. Hendricks entered an employment contract for a term of three years. (*Id.* at ¶ 28.) At the time the parties executed the contract, Dr. Scott Larson, Defendants' Senior Vice President and Chief Medical Officer, described Dr. Hendricks's work as exemplary. (*Id*. at ¶ 30.) In a written performance evaluation in November 2010, Dr. Larson and John Jones Jr., Senior Vice President of Defendants, represented that Dr. Hendricks met or exceeded performance standards. (*Id.* at 31.) Defendants terminated Dr. Hendricks's employment on or around May 18, 2013. (*Id.* at ¶ 26).

In the autumn of 2010, Dr. Hendricks became aware of what she describes as Defendants' policy of improperly certifying sonograms from obstetric ultrasound examinations. (*Id.* at ¶ 34.) Dr. Hendricks asserts that physicians Defendant employed certified sonograms despite "lack[ing] the training and the expertise to review and interpret the sonograms[,]" or "failing to . . . review the sonograms" altogether. (*Id.*) Dr. Hendricks describes an incident in which treating physicians employed by Defendants failed to detect a congenital diaphragmatic hernia during a patient's pregnancy. (*Id.* at ¶¶ 35.) She states that Defendants formally requested that Dr. Hendricks investigate the episode and provide an opinion concerning the care previously provided to the

patient.  (*Id.* at ¶ 36.)  In the course of her investigation, Dr. Hendricks spoke with, among others, "three physicians, OBGYNs, who worked at an arm of the Defendants . . . where the . . . patient was seen."  (*Id.* at ¶ 37.)  According to Dr. Hendricks, "[a]ll three OBGYNs, Drs. John Does I and II and Jane Doe, including the [patient's] treating physician . . . represented to Dr. Hendricks that the OBGYNs signed and thus certified obstetric ultrasound reports without viewing the associated sonograms."  (*Id.* at ¶ 38.)  Dr. Hendricks alleges that Dr. John Doe I "signed and thus certified the relevant obstetric ultrasound report without reviewing the associated sonogram and/or lacked the training to interpret said sonogram" on at least one other occasion.  (*Id.* at ¶ 39.)

Dr. Hendricks states that Defendants require their physicians to bill for the procedures they perform and that she is unaware of any of the Defendants' physicians who did not bill for "any and all" procedures they performed.  (*Id.* at ¶¶ 47-48.)  She says that Defendants internally audited their physicians' charting and billing and that division managers "tracked physicians' billings to ensure that all procedures were billed and billed properly."  (*Id.* at ¶ 49.)  She alleges "[u]pon information and belief, the Defendants' physicians, including the OBGYNs at [Bronson Obstetrics and Gynecological Associates], billed for every medical procedure performed, including obstetric ultrasound examinations.  (*Id.* at ¶ 51.)  Dr. Hendricks claims, "on information and belief, the Defendants billed, either recklessly or knowingly, for the obstetric ultrasound examinations, which amounted to worthless medical services, and requested payment from, inter alia, the U.S. government and State of Michigan."  (*Id.* ¶ 53.)

Dr. Hendricks states that she complained repeatedly to Defendants about what she describes as Defendants' policy of improperly certifying sonograms despite insufficient review. (*Id.* at ¶¶ 40 - 42.)  She offered to lead weekend training sessions for certain of Defendants' staff and to conduct

grand rounds to address the perceived insufficiencies. (*Id.* at ¶ 41.) Dr. Hendricks communicated to Dr. Larson, Mr. Jones, and others that, in her view, the alleged policy could be illegal. (*Id.* at ¶ 42.) On multiple occasions, Dr. Hendricks "stated that if the [training and grand rounds] offered by her [were] not accepted, then the Defendants' [alleged] Policy needed to be reported." (*Id.* at ¶¶ 42, 45.) Defendants permitted her to lead grand rounds on a quarterly basis until her termination. (*Id.* at ¶ 43.) In or around January 2011, Defendants terminated Dr. Hendricks's employment. (*Id.* at ¶ 46.)

Based on these allegations, Dr. Hendricks as Relator claims that Defendants violated the FCA and MMFCA. The FCA penalizes "[a]ny person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B) (2014).[1] Similarly, the MMFCA makes it illegal to "make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act . . . upon or against the state, knowing the claim to be false." MICH. COMP. L. § 400.607 (2014). Dr. Hendricks in her individual capacity also claims, among other things, that Defendants wrongfully terminated her employment in violation of Michigan public policy. Defendants move under FED.

---

[1] The FCA was amended in 2009. Before the 2009 amendments took effect, the provisions of the FCA particularly relevant to this case imposed liability on, among others, "[a]ny person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1) and(2). Dr. Hendricks does not specify the dates of submission of alleged false claims in her complaint. Whether the submissions she alleges occurred before or after the statute was amended does not affect the legal analysis in this case.

R. CIV. P. 9(b) and 12(b)(6) to dismiss all of the claims Dr. Hendricks brings as Relator, as well as her individual claim of violation of public policy.

**Legal Standards**

To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Though the Court must accept all well-pleaded factual allegations in the complaint as true, it need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation omitted).

Under FED. R. CIV. P. 9(b), a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." Complaints alleging violations of the FCA must comply with the heightened pleading standards of Rule 9(b); "defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). Michigan Court Rule 2.112(B)(1) likewise provides that allegations of fraud "must be stated with particularity," and the same heightened pleading standard applies to claims under the MMFCA. *State ex rel Gurganus v. CVS Caremark Corp.*, __ N.W. 2d __ (Mich. 2014) 2014 WL 2616577. Rule 9(b)'s requirements "should not be . . . decoupled from the general rule that a pleading must only be so detailed as is necessary to provide a defendant with sufficient notice to defend against the pleading's claims." *United States ex rel., SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008).

Multiple purposes underlie Rule 9(b)'s heightened pleading requirement. "Claims of fraud 'raise a high risk of abusive litigation.'" *United States v. Marlar*, 525 F.3d 439, 445 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 569 n. 14). Rule 9(b) also exists "to protect defendants from 'spurious charges of immoral and fraudulent behavior.'" *Id.* (quoting *United States ex rel. Bledsoe v. Cmty Health Sys., Inc.,* 501 F.3d 493, 510 (6th Cir. 2007) ("*Bledsoe* II")). Finally, "Rule 9(b) is intended to provide defendants with 'notice of the specific conduct with which they were charged,' so that the defendants can prepare responsive pleadings.'" *Id.* (quoting *Bledsoe* II, 501 F.3d at 510). The Rule 9(b) requirements for a *qui tam* action are demanding: "In complying with Rule 9(b), a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Bledsoe II*, 501 F.3d at 504 (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993); *accord SNAPP, Inc.*, 532 F.3d at 504; *Marlar*, 525 F.3d at 444. "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide [] examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *Marlar*, 525 F.3d at 444-45 (quoting *Bledsoe II*, 501 F.3d at 510)). Under Rule 9(b), malice, intent, knowledge, and other mental states may be alleged generally. Accordingly, a relator need not plead the knowledge or intent elements of a claim under the False Claims Act with particularity. *SNAPP, Inc.,* 532 F.3d 496 at 505. However, a *qui tam* complaint must at a minimum allege:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the government, and (4) what the defendants obtained as a consequence of the fraud.

*Sanderson v. HCA-The Healthcare Company*, 447 F.3d 873, 877 (6th Cir. 2006) (citing *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)).

**Analysis**

1.   *Qui Tam Claims (Counts I, II, IV)*

According to Dr. Hendricks, Defendants violated the FCA by "knowingly caus[ing] [their] agents to submit claims [1] for the review and interpretation of results of medical procedures by physicians lacking the training and expertise to make such a review and interpretation, and [2] for the results of said medical procedures that were reported as reviewed but were not." (docket # 42, ¶ 69.) She alleges that "Defendants have also violated [the FCA] by causing the states to submit false claims to the U.S. Government in the relevant forms, which would have falsely certified that a physician possessed the requisite training and expertise to review a sonogram and in fact reviewed the sonogram for which federal reimbursement was sought." (*Id.* at ¶ 70.) Dr. Hendricks contends that "Defendants have used a variety of false documents, including false submissions to the U.S. Government, to cause the U.S. Government to continue to pay and approve claims for reimbursement under the U.S. Government healthcare programs." (*Id.* at ¶ 74.) Dr. Hendricks asserts that Defendants violated the MMFCA by "knowingly caus[ing] false claims to be made, used and presented to the State of Michigan by [their] deliberate and systematic violation of federal and state laws, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs." (*Id.* at ¶ 84.) She states that "[u]pon information and belief, the State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers." (*Id.* at ¶ 85.)

Dr. Hendricks's allegations fail to satisfy the pleading requirements of Rule 9(b) and MCR 2.112(B)(1). It is not enough for "a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply . . . that the claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Sanderson*, 447 F.3d at 877. But that is precisely what Dr. Hendricks has done here. She has not pled with particularity even a single presentation of a false claim to the government. Yet "the fraudulent claim is the *sine qua non* of a False Claims Act violation." *Id.* at 878 (quoting *Clausen*, 290 F.3d at 131). Dr. Hendricks's amended complaint alleges neither the time nor place of the alleged misrepresentations. To satisfy Rule 9(b), the relator must allege both of those elements. *Id.* at 877. The relator must also articulate a particular injury. *Id.* Here, Dr. Hendricks has alleged generally that the government may have paid claims it would not otherwise have paid. This is too vague.

In *Chesbrough v. VPA, PC*, 655 F.3d 461 (6th Cir. 2011), the Sixth Circuit addressed allegations similar to those Dr. Hendricks brings. Applying the heightened pleading requirements of Rule 9(b), the court found the allegations insufficiently specific, because "the Chesbroughs failed to identify any specific fraudulent claim submitted to the government, as is required to plead an FCA violation with the particularity mandated by Federal Rule of Civil Procedure 9(b). *Chesbrough*, 655 F.3d at 464. The Chesbroughs, one or both of whom were physicians, ran Radiology Medical Consultants, a radiology service business. *Id.* Radiology Medical Consultants contracted with VPA, a provider of in-home medical services, to interpret images created by VPA's technologists. *Id.* The Chesbroughs alleged that the images VPA provided them were often of poor quality or defective, and after six months, Radiology Medical Consultants terminated its relationship with VPA. *Id.* at 465. The Chesbroughs later brought a *qui tam* action against VPA, alleging that diagnostic studies

billed by VPA were false or fraudulent under the FCA and MMFCA "because the tests were either not properly documented as to indication, were performed with equipment that did not conform to industry standard[s], or were administered by inadequately trained radiology technologists." *Id.* (internal quotation marks omitted). Among other things, they alleged that "60% of the ultrasound studies they reviewed did not have appropriate images to render a diagnostic interpretation" and that "the x-ray examinations and ultrasound studies often had no clinical history or identifying information attached." *Id.* They attached as exhibits to their complaint twenty-seven examples of x-ray examinations they alleged were defective, along with "the patient and ordering physician's names, the account number, the facility, the technician's name, and the date of the exam." *Id.* The Chesbroughs invoked a false certification theory of liability, claiming that "in submitting claims, VPA impliedly certified that the studies for which it billed met [industry] standards." *Id.* at 467-68. They also invoked a "worthless services" theory of liability as to certain studies they described as "non-diagnostic." *Id.* at 468. Both theories failed. To the extent Dr. Hendricks invokes the same theories in her case, they fail for similar reasons.

The Sixth Circuit describes a false certification theory of liability under the FCA: "When a claim expressly states that it complies with a particular statute, regulation, or contractual term that is a prerequisite for payment, failure to actually comply would render the claim fraudulent." *Chesbrough*, 655 F.3d at 467. Dr. Hendricks does not allege claims expressly stating such compliance. The Sixth Circuit also recognizes an "implied certification" theory of liability: "liability can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned." *Id.* at 468. (internal quotation omitted). Under the implied certification theory of liability, "it is not the violation of a regulation itself that creates a cause of action under the

FCA. Rather, noncompliance constitutes actionable fraud only when compliance is a prerequisite to obtaining payment." *Id.* Therefore, "a relator cannot merely allege that a defendant violated a standard – he or she must allege that compliance with the standard was required to obtain payment." *Id.* Dr. Hendricks has not made such an allegation. Like the Chesbroughs, she has not alleged that Medicare requires compliance with a particular standard as a prerequisite to payment. "Thus, requesting payment for tests that allegedly did not comply with a particular standard of care does not amount to a 'fraudulent scheme' actionable under the FCA. *Id.* at 468.

A "worthless services" theory of liability can support an FCA claim. *Id.* "A test known to be of 'no medical value,' that is billed to the government would constitute a claim for 'worthless services,' because the test is 'so deficient that for all practical purposes it is the equivalent of no performance at all.'" *Id.* (*quoting Mikes v. Straus*, 274 F.3d 687, 702-03 (2d Cir. 2001)). If a defendant "sought reimbursement for services that it knew were not just of poor quality but had *no* medical value, then it would have effectively submitted claims for services that were not actually provided. This would amount to a 'false or fraudulent' claim within the meaning of the FCA." *Id.* (emphasis in original). A "worthless services" claim still must satisfy the specificity requirements of Rule 9(b). *Id.* at 470. The Chesbroughs failed to specify any actual claim submitted for payment. Their worthless services claims therefore failed. The same hurdle bars Dr. Hendricks. To the extent she brings a worthless services claim on the theory that physicians falsely certified that they had reviewed sonograms, she has still failed to specify even one particular actual submission for payment. Therefore, she has not satisfied the requirements of Rule 9(b).

Dr. Hendricks suggests that a more relaxed pleading standard should apply in her case. The Court disagrees. In *Bledsoe II*, the court "left open the possibility that a court may 'relax' the

requirements of Rule 9(b) 'in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator.'" *Chesbrough v. VPA, PC*, 655 F.3d 461, 470 (6th Cir. 2011) (quoting *Bledsoe II*, 510 F.3d at 504 n. 12). The *Bledsoe II* court declined to speculate "as to the contours or existence of any such exception to the general rule that an allegation of an actual false claim is a necessary element of a FCA violation." *Bledsoe II*, 510 F.3d at 504 n. 12.) In *Chesbrough*, the court did "not foreclose the possibility that this court may apply a 'relaxed' version of Rule 9(b) in certain situations," but did "not find it appropriate to do so here." *Chesbrough*, 655 F.3d at 472. The court explained that it may be appropriate to relax the requirement that the relator identify an actual false claim "when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Id.* "Such an inference may arise when the relator 'has personal knowledge that the claims were submitted by Defendants . . . for payment." *Id.* (internal quotation omitted). As an example of such personal knowledge, the court points to a case in which "the plaintiff was a former billing specialist with specialized knowledge of defendant's billing practices, but could not identify specific claims because she no longer worked for defendants." *Id.* (citing *United States ex rel. Lane v. Murfreesboro Dermatology Clinic*, PLC, 2010 WL 1926131 (E.D. Tenn. May 12, 2010)) The court also references a case in which the relator "was a former billing department employee who alleged that she had seen claims with fraudulently altered billing codes submitted to Medicare . . . . [S]he had personal knowledge that billings were submitted because she had worked in the billing department." *Id.* at 471 (citing *Hill v. Morehouse Medical Associates, Inc.*, 2003 WL 22019936 (11th Cir. August 15, 2003)). As one more example of personal knowledge, the court notes a case

in which the Eleventh Circuit "found the pleading standard satisfied when a nurse 'believed' fraudulent claims for services were submitted based on her personal discussions with an office administrator." *Id.* (citing *United States v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005)). Dr. Hendricks's allegations do not reflect this kind of personal knowledge. In light of the important policy bases for the heightened pleading requirements of Rule 9(b) in the context of the FCA, and absent any Sixth Circuit precedent actually applying a relaxed standard in an FCA case, the Court does not believe it is appropriate to apply a relaxed pleading standard in this case.

For all of these reasons, the Court concludes that dismissal of the claims Dr. Hendricks brings as Relator for failure to satisfy the pleading requirements of Rule 9(b) and MCR 2.112(B)(1) is appropriate.

2.  *Public Policy Claim (Count IX)*

Dr. Hendricks in her individual capacity claims that Defendants terminated her employment in violation of Michigan public policy. In *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W. 2d 710 (1982), Michigan's Supreme Court recognized three examples of public policy exceptions to an employer's right to discharge an at-will employee under the employment at will doctrine. Under *Suchodolski* and its progeny,

> [a]n at-will employee's discharge violates public policy if any one of the following occurs: (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment.

*McNeil v. Charlevoix County*, 484 Mich. 69, 79, 772 N.W. 2d 18, 24 (2009) (citing *Suchodolski*, 412 Mich. at 695–96, 316 N.W.2d at 711–12). It appears that Dr. Hendricks is invoking the second exception. Successful public policy claims under *Suchodolski* are rare, but the Court believes a more developed factual record is necessary to resolve the claim, and that Dr. Hendricks has at least stated a claim sufficient to survive a Rule 12(b)(6) challenge. Rule 56 will permit the parties to assess the claim on a fully developed factual record.

**Conclusion**

For these reasons, the Court concludes that dismissal of the claims Dr. Hendricks brings as Relator is appropriate, and that dismissal of Dr. Hendricks's individual claim of wrongful termination in violation of public policy is not warranted. An order consistent with this Opinion will enter separately.


Dated:    July 30, 2014             /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE